**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **TERESA CARIDAD ECHEMENDIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:05-CV-53** |
| | ) | |
| **GENE B. GLICK MANAGEMENT** | ) | |
| **CORPORATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

## I. INTRODUCTION

For approximately fifteen years prior to her commencing this lawsuit, *pro se* Plaintiff

Teresa Echemendia lived in an apartment building managed by Defendant Gene B. Glick

Management Corporation ("Glick") and received Section 8 housing benefits from the

Department of Housing and Urban Development ("HUD").  Echemendia, who is disabled[1] and of

Hispanic origin, sued Glick, certain Glick employees, and various other Defendants associated

with Glick, asserting a flurry of federal constitutional and state law claims, including that

Defendants discriminated against her on the basis of her disability and Hispanic origin in

violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*., as amended ("FHA").[2]

Defendants have now moved for summary judgment on all claims. (Docket # 91.)  After

receiving a notice of the motion for summary judgment from Defendants pursuant to Local Rule

56.1(e) and after receiving two extensions of time from this Court, (*see* Docket # 93, 101, 107,

---

[1] Echemendia explains that she "suffer[s] from psychiatric, emotional, or other mental illness[] . . . ." (Compl. at 6.)

[2] This Court has subject matter jurisdiction under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

109, 111), Echemendia failed to respond to Defendants' motion, and the time for her to do so has now expired.[3]

For the reasons given herein, Defendants' motion for summary judgment will be GRANTED with respect to Echemendia's federal claims, and this Court will decline to exercise its supplemental jurisdiction over her state law claims.

## II. FACTUAL AND PROCEDURAL BACKGROUND[4]

Defendant Glick manages several residential rental properties including Woodbridge Apartments ("Woodbridge"), Fairington Apartments ("Fairington"), and Richfield Apartments ("Richfield"), which are all located in Fort Wayne, Allen County, Indiana. (Aff. of Cindy Bane ¶ 3.)  Woodbridge is a residential apartment complex with approximately one hundred and fifty dwelling units. (*Id.* ¶ 6; Decl. of Edward Hinsberger ¶ 4.)  The owners of Woodbridge currently have a Housing Assistance Payment contract with HUD. (Bane Aff. ¶ 7; Hinsberger Decl. ¶ 5.) Under the contract, twenty-six Woodbridge units are specifically reserved for Section 8 rental assistance. (Bane Aff. ¶ 7; Hinsberger Decl. ¶ 5.)

Defendant Cindy Bane is, and at all times relevant hereto was, a regional property manager for Glick and in such capacity supervised its employees who were assigned to work at Glick-managed properties in Allen County, including Woodbridge, Fairington, and Richfield. (Bane Aff. ¶¶ 2, 4.)  Defendant Sharon Hankins has been employed by Glick as the property manager at Fairington since October 1993. (*Id.* ¶ 16; Aff. of Sharon Hankins ¶ 2.)  Defendant

---

[3] Echemendia's response brief was due on February 16, 2007. (Docket # 115.)

[4] As will be discussed *infra*, Echemendia failed to submit a factual statement called for by Local Rule 56.1; therefore, she has conceded Defendants' version of the facts as set forth in their memorandum supporting summary judgment. (*See* Defs.' Mem. in Supp. of the Mot. for Summ. J. at 2-8); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

Kolleen Scott was employed by Glick as the Woodbridge property manager from February 3, 2001, to June 18, 2004. (Bane Aff. ¶ 20; Aff. of Kolleen Scott ¶¶ 2, 3.)  Defendant Desiree Elett was employed by Glick from July 25, 2001, to January 3, 2005, and her last Glick assignment was as the assistant property manager at Fairington. (Aff. of Desiree R. Elett ¶¶ 2, 3.)

On November 15, 1990, Echemendia applied to reside at Woodbridge in the Section 8 Program, requesting federal preference as a victim of domestic violence. (Bane Aff. ¶ 8.)  Three weeks later, Echemendia's application was approved, and she moved into Woodbridge. (*Id.* ¶ 9.) Ultimately, Echemendia resided in the same apartment at Woodbridge for approximately fifteen years, timely completing the required annual HUD re-certifications from 1990 through 2004.[5] (*Id.* ¶¶ 9, 29.)

In that regard, Glick explains that HUD regulations mandate that it examine each Section 8 family's income on a yearly basis, that it complete an annual inspection of Section 8 dwelling units, and that its leases with Section 8 participants comply with HUD regulations and requirements.[6] (*Id.* ¶¶ 10-12; Hinsberger Decl. ¶¶ 6, 7.)  Glick further reports that in 2000 HUD appointed contract administrators that increased monitoring of owner/agent Section 8 compliance. (Bane Aff. ¶ 14.)  In response to that HUD action, Glick emphasized to its property managers the importance of completing routine resident file quality control reviews in advance of the annual contract administrator compliance audits. (*Id.*)

In February 2001, Glick moved the responsibility for monitoring Section 8 paperwork for

---

[5] Echemendia never applied to reside at Fairington or Richfield and never entered into any type of contractual relationship with either entity. (*Id.* ¶ 44.)

[6] HUD officials confirmed to Glick that the lease between Woodbridge and Echemendia in effect prior to December 1, 2005, met all HUD regulations and requirements for Section 8 participants. (*Id.* ¶ 13; Hinsberger Decl. ¶ 9.)

Woodbridge from the Glick staff at Woodbridge to the Glick staff at Fairington, primarily for two reasons. (*Id.*; *see also* Hankins Aff. ¶ 3.)  First, HUD's appointment of the contract administrators in 2000 increased monitoring of owner/agent Section 8 compliance with HUD occupancy requirements, which were very detailed, and Glick found it was becoming a burden to keep its Woodbridge staff trained in both the Section 8 (assisted) side and the conventional (unassisted) side of the property. (Bane Aff. ¶ 14.)  Second, Glick perceived that the duties of the new Woodbridge property manager did not allow sufficient time to attend to the paperwork related to the twenty-six Section 8 files at Woodbridge while serving all residents effectively, and no other Woodbridge staff member at that time was sufficiently trained in the Section 8 program to assist the property manager in processing Section 8 paperwork. (*Id.*)  Thus, Glick explains that it made its staffing decision in an effort to better process the Section 8 paperwork. (*Id.*)

On September 10, 2001, Echemendia contacted the Glick regional office to complain about Hankins. (*Id.* ¶ 17.)  During a telephone conversation between Bane and Echemendia, Echemendia complained that Hankins was a "nasty person"; consequently, Bane apologized to Echemendia for Hankins's alleged rudeness and assigned the responsibility to complete Echemendia's 2001 annual Section 8 re-certification to another Glick staff person. (*Id.* ¶ 18.)

On November 27, 2001, Hankins conducted the annual HUD-required inspection of Echemendia's dwelling unit. (Hankins Aff. ¶ 10, Ex. G.)

On December 21, 2001, Echemendia placed a telephone call to the Glick regional property office, complaining that Scott, the Woodbridge property manager, was not addressing

her concerns about the behavior of another tenant.[7] (Bane Aff. ¶ 19.)

On December 27, 2001, Echemendia spoke with Bane again via telephone, complaining
that it took three years to fix her bathroom. (*Id*. ¶ 22.) Echemendia also explained to Bane that
she had called the police seven times about her neighbors though she had not filled out a written
complaint. (*Id*.) In addition, during the telephone conversation Echemendia mentioned that she
needed a new drapery rod in her front room; thus, Bane wrote out a special directive to fulfill
Echemendia's drapery rod service request. (*Id*.)

On February 8, 2002, Echemendia telephoned HUD and alleged that Defendants were
discriminating against her.[8] (Compl. at 6.)

On March 4, 2002, Echemendia again telephoned the Glick regional office with several
questions and concerns, this time requesting that Bane respond in writing. (Bane Aff. ¶ 23.) As a
result, on March 8, 2002, Bane wrote a letter to Echemendia addressing the questions and
concerns she raised in her March 4 telephone call; Bane never received a response from
Echemendia concerning the letter. (*Id*. ¶¶ 24, 25.)

On May 20, 2002, another telephone conversation took place between Bane and
Echemendia during which Echemendia reported that she smelled smoke in her apartment. (*Id*. ¶
26.) Bane sent a Woodbridge staff person over to Echemendia's apartment to investigate.[9] (*Id*.)

_____

[7] Scott was not involved in the Section 8 assistance re-certification process for Echemendia or any other
Woodbridge tenant after May 2001. (Scott Aff. ¶¶ 5, 6.)

[8] Bane, Scott, Hankins, Girard, and Elett were never informed prior to the date that Echemendia filed her
complaint in this Court that she had made any complaint or claim of discrimination to HUD or any other federal or
state agency. (Bane Aff. ¶ 38; Hankins Aff. ¶ 11; Girard Aff. ¶ 21; Scott Aff. ¶ 10; Elett Aff. ¶ 7.)

[9] After May 2002, Bane had no further direct contact with Echemendia. (*Id*. ¶ 28.)

On October 2, 2002, and again on September 25, 2003, Hankins conducted the annual HUD-required inspections of Echemendia's dwelling unit. (Hankins Aff. ¶ 10, Exs. H, I.)

On December 13, 2003, Elett, who was Fairington's assistant property manager at the time, sent Echemendia a letter requesting a copy of her divorce decree, which was discovered to be missing from her resident file during a routine resident quality control review; three months later, having not yet received the requested decree, Hankins sent Echemendia a second letter requesting the missing document. (Bane Aff. ¶¶ 40, 41; Hankins Aff. ¶ 7; Elett Aff. ¶ 4.)  During the period from July 2003 to March 2004, Glick also sent letters to at least three other Woodbridge tenants requesting items missing from their resident files. (Bane Aff. ¶ 43.)

On August 9, 2004, Echemendia signed her annual re-certification initial notice, which advised her that she would be charged market rate rent if she did not complete the 2005 re-certification process.[10] (*Id*. ¶ 31.)  Two weeks later, Hankins conducted the annual HUD-required inspection of Echemendia's dwelling unit. (Hankins Aff. ¶ 10, Ex. J.)

On October 14, 2004, Echemendia provided Glick with a copy of her divorce decree. (Bane Aff. ¶ 42.)

In November 2004, after Glick assigned John Girard as the new Woodbridge property manager and after it made staffing changes at Fairington, Glick returned responsibility for monitoring Woodbridge's Section 8 paperwork to the Glick staff assigned to Woodbridge. (Bane Aff. ¶ 15; Aff. of John Girard ¶ 2.)  On November 19, 2004, Echemendia met with Girard to

---

[10] In her amendment to her complaint, Echemendia stated that after she missed her scheduled re-certification appointment on August 6, 2004, she "dropped by" the Glick office to complete the re-certification paperwork but was told by Elett that "from now on [she] would have to make an appointment." (Compl. at 14.) Echemendia asserts that "this new requirement" is another incident of retaliation for her complaints of unfair treatment by Defendants. (Compl. at 14.)

discuss unauthorized vehicles parking in a handicapped parking space near her apartment.[11] (Bane Aff. ¶ 36; Girard Aff. ¶ 3.)  During that conversation, Echemendia informed Girard that she had occasionally observed Woodbridge service vehicles parked in the handicapped parking space, though she could not identify the Woodbridge employee who was parking the vehicle there. (Girard Aff. ¶ 3.)  Girard promised Echemendia that he would monitor the situation, inviting her to call him at any time if she noticed someone using the handicapped parking space improperly. (*Id.*)

Also during the November 19 conversation, Echemendia told Girard that Hankins had informed her she could lose her subsidized housing if the inspector found as little as a burned-out lightbulb. (*Id.* ¶ 6; *see also* Hankins Aff. ¶ 9.)  Girard assured Echemendia that he had never in his experience seen or heard of any such harsh action. (Girard Aff. ¶ 6.)  Echemendia also expressed concern to Girard that the Woodbridge staff did not like her and that they wanted to "retaliate" against her; Girard assured Echemendia that the Woodbridge staff enjoyed having her as a tenant and that he hoped she would continue to be a resident for a very long time. (*Id.* ¶ 7.)

As a result of his meeting with Echemendia, Girard reminded the Woodbridge staff during his November 22 staff meeting that no personal or service vehicles were to be parked in any handicapped parking space. (*Id.* ¶ 4.)  Nonetheless, the next day Echemendia phoned Girard to alert him that the handicapped parking space was improperly occupied; Girard immediately sent out a Woodbridge staff member to ticket the improperly parked vehicle. (*Id.* ¶ 5.)

---

[11] Echemendia's vehicle was never handicapped licensed at any time during her tenancy at Woodbridge. (Bane Aff. ¶ 36, Girard Aff. ¶ 3.)

Echemendia's 2004 annual re-certification, which was processed by Elett, proceeded

without incident and became effective December 1, 2004. (Bane Aff. ¶ 30; Elett Aff. ¶ 5.)

Echemendia filed a thirty-one page complaint commencing this suit on February 8, 2005,

and on May 31, 2005, she filed a twelve-page amendment to her complaint.[12] (Docket # 1, 4, 26,

38.)

Between August 1, 2005, and October 1, 2005, Woodbridge sent Echemendia three

additional reminders of her December 1, 2005, re-certification anniversary date. (Girard Aff. ¶

8.) Each of the reminders advised Echemendia that her rent would be increased to the market rate

if the re-certification process was not completed by December 1, 2005. (*Id.* Exs. A-C.)

As a result, on October 11, 2005, Echemendia filed a motion for injunctive relief, seeking

to enjoin Glick from terminating her Section 8 housing benefits; her motion was denied. (Docket

# 41, 48.)  On December 1, 2005, Woodbridge raised Echemendia's rent to the market rate after

she failed to complete the re-certification process by the deadline. (Bane Aff. ¶ 32; Girard Aff. ¶

9.)  Shortly thereafter, Echemendia filed a second motion for injunctive relief, this time

requesting that the Court order Glick to reinstate her Section 8 housing subsidy; Echemendia's

second motion met the same fate as her first.[13] (Docket # 51, 63.)

Woodbridge eventually initiated eviction proceedings against Echemendia for non-

payment of rent. (Bane Aff. ¶¶ 33, 34.)  As a result, on March 20, 2006, the Allen Superior Court

---

[12] In the amendment to her complaint, Echemendia asserted that in March 2005 Glick requested that she sign a "checking account balance certification," which she contends was duplicative and therefore "discriminatory and [] just one more attempt by Glick, et al., to retaliate against [her]." (Am. Compl. at 3-6.)

[13] The Court's decision to deny Echemendia's second request for injunctive relief (Docket # 73) was affirmed on reconsideration by this Court and upon appeal to the Seventh Circuit Court of Appeals. *Echemendia v. Gene B. Glick Mgmt. Corp.*, No. 06-1799 (7th Cir. Sep. 28, 2006) (unpublished opinion).

8

found Echemendia to be $1,891 in arrears in rental payments and hence granted Woodbridge immediate possession of her dwelling unit.[14] (*Id.* ¶ 34, Ex. I.)  Thus, Echemendia no longer resides at Woodbridge. (*Id.* ¶ 35.)

On August 11, 2006, Defendants filed the instant motion for summary judgment. (Docket # 91.)  As articulated *supra*, after receiving Defendants' notice of its motion for summary judgment pursuant to Local Rule 56.1(e) and after being afforded two extensions of time, Echemendia ultimately failed to respond to Defendants' motion.

### III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920.  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must

---

[14] The Allen Superior Court's decision granting the eviction was later affirmed by the Indiana Court of Appeals. *Echemendia v. Gene B. Glick Mgmt. Corp.*, 857 N.E.2d 28 (Ind. Ct. App. 2006) (unpublished disposition).

9

affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771. In that regard, "the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the 'Statement of Genuine Issues' filed in opposition to the motion, as supported by the depositions, discovery responses, affidavits and other admissible evidence on file." N.D. Ind. L.R. 56.1(b); *see also Bradley v. Work*, 154 F.3d 704, 707-08 (7th Cir. 1998); *Waldridge*, 24 F.3d at 922 (collecting cases in which the Seventh Circuit Court of Appeals has "upheld the strict enforcement of [Local Rule 56.1]").

## IV. DISCUSSION

In her thirty-one page complaint and twelve-page amendment thereto, Echemendia brought a plethora of federal and state claims.  After preliminary motion practice, the following federal claims remain: (1) handicap discrimination, national origin discrimination, and retaliation under the FHA; (2) disability discrimination under Section 504 of the Rehabilitation Act; (3) violation by Bane, Hankins, and Elett of 42 U.S.C. § 1983 by depriving Echemendia of her constitutional rights under the Fourth Amendment; (4) conspiracy to deprive Echemendia of her civil rights; and (5) violation of Executive Orders 12892, 11063, and 13217.[15]  In addition, Echemendia asserts state law claims of breach of contract, invasion of privacy, and violation of the Indiana Fair Housing Act, Ind. Code § 22-9.5-1-1 *et seq.*

As stated *supra*, while Echemendia vigorously advanced these claims in her complaint, she ultimately failed to respond to Defendants' motion for summary judgment.  Thus, at this

---

[15] Echemendia's constitutional claim against Glick, Woodbridge, Fairington, Richfield, and Scott was dismissed with prejudice on September 27, 2005, and all of her claims against HUD were dismissed with prejudice on October 25, 2005. (Docket # 38, 44.)

juncture, Echemendia has seemingly abandoned all of her claims. *Bombard v. Fort Wayne Newspapers, Inc*., 92 F.3d 560, 562 n.2 (7th Cir. 1996) (concluding that plaintiff had abandoned claim after failing to respond to defendant's arguments concerning such claim in its motion for summary judgment); *see generally Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (emphasizing that "summary judgment is the put up or shut up moment in the lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events" (internal quotation marks and citations omitted)).

In any event, at a minimum the facts as articulated by Defendants in their opening brief are admitted to exist without controversy. N.D. Ind. L.R. 56.1(b); *Bradley*, 154 F.3d at 707-08; *Waldridge*, 24 F.3d at 922; *Selan v. Kiley*, 969 F.2d 560, 566 n.8 (7th Cir. 1992) ("[T]he only acts relevant to our review are those that [the plaintiff] brought to the district court's attention – by reference to specific facts in affidavits, depositions, answers to interrogatories or admissions – in response to the defendants' motion for summary judgment."); *see generally McMasters v. United States*, 260 F.3d 814, 818 (7th Cir. 2001) ("The fact that [the plaintiff] was proceeding *pro se* does not excuse her failure to comply with procedural rules.").  It is with this backdrop that the Court will evaluate Echemendia's claims on the merits. *See generally Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996) ("[I]t is the well-established duty of the trial court to ensure that the claims of a *pro se* litigant are given a fair and meaningful consideration." (internal quotation marks and citations omitted)).

### A.  Statute of Limitations

Before turning to the merits of Echemendia's claims, however, a threshold matter must be addressed – that is, the impact of the statute of limitations in this case.  As explained by

Defendants in their opening brief, a two-year statute of limitations applies to Echemendia's federal claims, as the FHA specifically prescribes a two-year statute of limitations and her Rehabilitation Act claim, constitutional claim against the individual Defendants, and conspiracy claim are all governed by the personal injury statute of limitations in the state where the injury occurred, which in this case is Indiana. *Delgado-Brunet v. Clark*, 93 F.3d 339, 342 (7th Cir. 1996) ("*Bivens* action, like actions under § 1983, are considered as personal injury claims and are governed by the personal injury statute of limitations and tolling laws in the state where the alleged injury occurred."); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 933 (7th Cir. 1993) (concluding that the state two-year statute of limitations for personal injury applies to claims brought under the Rehabilitation Act since the Act does not prescribe a statute of limitations); *Wilson v. Giesen*, 956 F.2d 738, 741 n.4 (7th Cir. 1992).  In Indiana, the personal injury statute of limitations is two years. Ind Code § 34-11-2-4.

However, if Echemendia can link time-barred acts to acts that occurred within the relevant period, her otherwise time-barred claims could survive under the "continuing violation doctrine." *Selan*, 969 F.2d at 564.  Under the "continuing violation doctrine," the statute of limitations is left open until a final injury has occurred. *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001).  Applying the doctrine, "the question is whether, in response to the [D]efendants' motion for summary judgment, [Echemendia] produced sufficient evidence to establish that there existed a genuine issue of fact whether the [D]efendants' acts were related closely enough to constitute a continuing violation or were merely discrete, isolated, and completed acts which must be regarded as individual violations." *Selan*, 969 F.2d at 565 (internal quotation marks and citation omitted).

12

Here, Echemendia has produced absolutely *no* evidence in response to Defendants' summary judgment motion to warrant the application of the continuing violation doctrine in this instance.  Moreover, Echemendia does not explain how the events prior to February 7, 2003, contributed to any "cumulative injury" to her constitutional rights such that the continuing violation doctrine would apply. *Heard*, 253 F.3d at 320.  In short, Echemendia fails to develop *any* argument in support of the continuing violation doctrine, and thus she cannot rely on that doctrine to evade the statute of limitations. *Koszola,* 385 F.3d at 1111; *DDI Seamless Cylinder Int'l, Inc. v. Gen. Fire Extinguisher Corp.*, 14 F.3d 1163, 1168 (7th Cir. 1994) ("An issue must be pressed, must be argued and supported; a bare conclusion is not enough.").  Thus, any acts that occurred prior to February 7, 2003, are considered time-barred.[16]

Now, having disposed of this threshold issue, we proceed to address Echemendia's claims on the merits.[17]

### B.  Handicap Discrimination Under the FHA

The FHA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." 42 U.S.C. § 3604(f); *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996).  The Seventh Circuit Court of Appeals, however,

---

[16] Moreover, during the course of this litigation, Echemendia has made various allegations concerning Defendants' acts or omissions in connection with its administration of the Section 8 re-certification process that occurred after she filed her original complaint on February 8, 2005.  As the Court stated in its Opinion and Order dated January 30, 2006, these claims "more accurately fall within the realm of supplemental pleadings." (Op. and Order dated Jan. 30, 2006, at 2 n.2.)  Echemendia, however, has never sought to supplement her complaint with any allegations relating to Defendants' acts or omissions that occurred after the date she filed her original complaint, despite having until February 27, 2006, to do so. (*See* Docket # 62); *see generally* Fed. R. Civ. P. 15(d).

[17] Also, as a global matter with respect to the claims to be discussed *infra*, Echemendia did not have a contractual relationship with either Fairington or Richfield and never applied to reside at either location; consequently, she particularly fails to produce any evidence to support claims against these two Defendants.

13

recently stated that the FHA "contains no hint either in its language or its legislative history of a concern with anything but *access* to housing." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004) (concluding that plaintiffs who had acquired property and were subsequently harassed on the basis of their religion had no claim under § 3604 since they were not denied access to property).  In that regard, a majority of the courts considering § 3604 have held that "if the challenged discriminatory activity occurs after a buyer has already purchased his or her home, and if such activity is not one which results in either an actual or constructive deprivation of that property, then such activity is not prohibited by the FHA." *Savanna Club Worship Servs., Inc. v. Savanna Club Homeowners' Ass'n, Inc.*, 456 F. Supp. 2d 1223, 1228 (S.D. Fl. 2005) (collecting cases).

In the instant case, at the time Echemendia filed her complaint in February 2005 seeking actual and punitive damages (not injunctive relief) under a claim of FHA handicap discrimination, she was still residing in her Woodbridge apartment.  In fact, her Section 8 status had just been re-certified by Glick two months earlier for the calendar year 2005.  Consequently, it is clear that Echemendia had not experienced an actual or constructive deprivation of her Woodbridge apartment at the time she advanced her claim, and thus Echemendia's FHA handicap discrimination claim fails at the outset as a matter of law. *See generally J.N.S., Inc. v. Indiana*, 712 F.2d 303, 305 (7th Cir. 1983) ("It is insufficient that an actual controversy may occur in the future; it must presently exist in fact.").

Moreover, even if Echemendia is afforded the benefit of considering her later loss of Section 8 benefits and eviction, her handicap discrimination claim still fails.  A plaintiff may proceed under any one of three general theories in advancing a claim of handicap discrimination

under the FHA: (1) disparate treatment, that is, intentional discrimination; (2) disparate impact; or (3) failure to make reasonable accommodations. *Oak Ridge Care Ctr. v. Racine County, Wis.*, 896 F. Supp. 867, 874 (E.D. Wis. 1995); *Harris v. Chicago Hous. Auth.*, No. 97 C 6285, 1998 WL 386371, at *4 (N.D. Ill. July 2, 1998).

As to the second theory, while she conclusorily alleges in her complaint that Defendants discriminate against the disabled by segregating their housing and by failing to properly promote its apartments to those individuals who are disabled but not mobility-impaired, Echemendia fails to provide any statistics to support her allegations.  Thus, she apparently chose not to proceed under the disparate impact method, that is, by showing that Defendants' policies have a disproportionate impact on the disabled. *See Flores v. Village of Bensenville*, No. 00 C 4905, 2003 WL 1607795, at *6 (N.D. Ill. March 26, 2003); *see also Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988) ("The evidence in . . . 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities.").  And, as to the third theory, though Echemendia advanced a reasonable accommodation claim in her complaint concerning Defendants' failure to accommodate an alleged allergy to second-hand smoke, this event occurred in March 2002 and thus is barred by the two-year statute of limitations.  Accordingly, Echemendia's only chance of success is under the first theory – intentional discrimination.

As direct evidence of discrimination, Echemendia alleges that Defendants (1) requested her divorce decree for her resident file; (2) failed to enforce the proper use of handicapped parking spaces, (3) failed to timely make repairs in her apartment; (4) requested that she sign a document certifying her checking account balance; (5) required annual inspections of her

15

apartment and the apartments of other Section 8 tenants in compliance with HUD regulations, but did not require inspections of the units of non-Section 8 tenants; and (6) ultimately evicted her for non-payment of rent.[18]   Contrary to Echemendia's allegations, however, these facts do not constitute direct evidence of intentional handicap discrimination. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) ("Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." (citation omitted)); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (explaining that direct evidence of discrimination "can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents").

Furthermore, under the indirect method of proving discrimination articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[19] Echemendia fails to produce any evidence that indicates she was treated differently than any similarly situated, non-disabled tenant. *See Grubbs v. Hous. Auth. of Joliet*, No. 91 C 6454, 1997 WL 281297, at *15-17 (N.D.

---

[18] In her complaint, Echemendia does not identify which of these alleged actions are the result of handicapped discrimination versus national origin discrimination; thus, the Court will consider them in both contexts.          In addition, Echemendia contends that Glick's performance of criminal background checks on its Section 8 residents is discriminatory; however, not only does Echemendia acknowledge that HUD regulations *require* Glick to perform background checks on its prospective Section 8 tenants, but she fails to link her allegation to disabled or Hispanic residents. (Am. Compl. at 11.)  Consequently, her assertion concerning background checks warrants no further mention.

[19] The indirect method is the well-known *McDonnell Douglas* burden-shifting framework. *E.g.*, *King v. Preferred Technical Group*, 166 F.3d 887, 891-92 (7th Cir. 1999).  Here, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.  In the context of employment discrimination claims, the *prima facie* case requires four showings: (1) the plaintiff was a member of a protected class; (2) the plaintiff was meeting the employer's legitimate expectations or was qualified for the job in question; (3) the plaintiff suffered an adverse employment action; and (4) similarly situated employees who were not members of the plaintiff's protected class were treated more favorably. *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995); *see also Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004).  If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802.  Once the defendant has done so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *Id.* at 804.

Ill. May 20, 1997) (applying the *McDonnell Douglas* indirect method in a claim of FHA handicap discrimination involving the context of the terms and conditions of tenancy). For example, Echemendia produces absolutely no evidence indicating that Glick only requested documents from disabled tenants, that it only failed to timely make repairs in disabled tenants' apartments, or that it was enforcing its parking polices in a way that gave preferential treatment to non-disabled residents. Likewise, Echemendia did not produce any evidence indicating that Glick only inspected the units of its disabled tenants, that it segregated the housing of the disabled, or that it failed to promote the Section 8 program to the disabled community. Furthermore, Echemendia has not identified a non-disabled resident who failed to pay rent but was not ultimately evicted. Thus, Echemendia fails to make out a *prima facie* case of handicap discrimination under the FHA.

Moreover, even if she had established a *prima facie* case, Defendants have provided legitimate, non-discriminatory reasons for their actions.[20] For example, they explain that Glick requested Echemendia's divorce decree as a result of a routine audit of her resident file, a procedure that Glick increased in recent years due to heightened HUD scrutiny. Also, HUD regulations *mandate* that Glick perform annual inspections of the units of its Section 8 residents. 24 C.F.R. § 886.323(d). Furthermore, Girard's prompt reminder to the Woodbridge staff concerning the proper use of parking spaces certainly is not evidence of a discriminatory animus on the part of Glick. Finally, Echemendia's loss of Section 8 status is a foreseeable consequence of a failure to participate in the re-certification process, *see* 24 C.F.R. § 886.324(c), and her later

---

[20] In fact, Bane, Hankins, and Scott were unaware that Echemendia claimed any specific type of disability and state that they did not perceive her as disabled; Bane and Hankins were aware, however, that Echemendia received a monetary allowance on her HUD 50059 for a handicap and/or disability. (Bane Aff. ¶ 37, Hankins ¶ 8, Scott ¶ 9.)

eviction is a predictable consequence of her failure to pay the rent due.

Simply, Echemendia has utterly failed to produce any evidence to substantiate her allegation of handicap discrimination, and thus there is no material issue of genuine fact requiring a trial.  Therefore, summary judgment will be granted with respect to Echemendia's FHA handicap discrimination claim.

### C.  National Origin Discrimination Under the FHA

Section 3604(b) of the FHA also prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . national origin." 42 U.S.C. § 3604(b).  Thus, like her handicap discrimination claim, Echemendia's claim of FHA national origin discrimination fails at the outset as a matter of law because she did not experience an actual or constructive deprivation at the time she advanced her claim. *Halprin*, 388 F.3d at 329; *Savanna Club Worship Servs.*, 456 F. Supp. 2d at 1228.

Moreover, even if we afford Echemendia the benefit of considering her later eviction, her national origin discrimination claim still fails.  Like handicap discrimination, the elements of national origin discrimination under the FHA closely mirror the elements of employment discrimination; thus, a plaintiff must establish that a defendant "had a discriminatory intent either directly, through direct or circumstantial evidence, or indirectly, through the . . . *McDonnell Douglas* test." *Kormoczy v. Sec'y, U.S. Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823-24 (7th Cir. 1995); *see also Roberts v. NLSB*, No. 01 C 1735, 2002 WL 925023, at *2 (N.D. Ill. May 8, 2002).

Though Echemendia makes a bald assertion that "Glick has, in Fort Wayne, Indiana,

18

intentionally constructed its apartment communities in areas of the city that are predominantly (Non-Hispanic) white . . . ," (Compl. at 3), she offers absolutely no evidence to support her accusation.  As concluded *supra*, the events Echemendia alleges as evidence of direct discrimination are insufficient to constitute direct evidence of intentional discrimination, whether on the basis of Echemendia's handicap or national origin.

Likewise, under the indirect method, Echemendia fails to produce any evidence that indicates she was treated differently than any similarly situated, non-Hispanic tenant.  For instance, Echemendia produces no evidence suggesting that Glick only requested documents from Hispanic tenants, that it failed to timely make repairs only in Hispanic tenants' apartments, or that it was enforcing its parking polices in a way that gave preferential treatment to non-Hispanic residents.  Similarly, Echemendia did not produce any evidence indicating that Glick only inspected the units of its Hispanic tenants.  Furthermore, Echemendia has not identified a non-Hispanic resident who failed to pay rent but was not ultimately evicted.

Consequently, Echemendia fails to make out a *prima facie* case of national origin discrimination under the FHA.  Moreover, even if she had established a *prima facie* case, as discussed *supra* Defendants have provided legitimate, non-discriminatory reasons for their actions that Echemendia has failed to rebut.

Thus, like her handicap discrimination claim, Echemendia has utterly failed to produce any evidence to substantiate her allegation of national origin discrimination, and thus there is no material issue of genuine fact requiring a trial.  Hence, summary judgment will be granted with respect to Echemendia's FHA national discrimination claim.

*D.  Retaliation Under the FHA*

19

The FHA also prohibits retaliation for engaging in protected activity. 42 U.S.C. § 3617. To prevail on her claim of retaliation under the FHA, Echemendia must establish that: "(1) she is a protected individual under the FHA, (2) she engaged in the exercise or enjoyment of her fair housing rights . . ., (3) Defendants were motivated in part by an intent to discriminate, or their conduct produced a disparate impact, and (4) Defendants coerced, threatened, intimidated, or interfered with [her] on account of her protected activity under the FHA." *East-Miller v. Lake County Highway Dep't*, 421 F.3d 558, 563 (7th Cir. 2005).

Clearly, Echemendia has not established the third element of her *prima facie* case.  As discussed *supra*, Echemendia has failed to show, directly or indirectly, that Defendants intentionally discriminated against her on the basis of her disability or Hispanic origin or that Defendants' actions produced a disparate impact on its disabled or Hispanic residents.[21]

In addition, Echemendia fails to established the fourth element of her FHA retaliation claim – that Defendants' actions rose to the level of coercion, threat, intimidation, or interference as a result of her complaints.  For example, Echemendia asserts that Defendants retaliated against her by asking her, after she missed her scheduled session, to make an appointment to complete her re-certification process rather than simply stopping by the office.  Clearly, this alleged act by Defendants hardly rises to the level of retaliation. *Cf. Walton v. Claybridge Homeowners Assoc., Inc*., No. 1:03-CV-69-LJM-WTL, 2004 WL 192106, at *6 (S.D. Ind. Jan. 22, 2004) (collecting cases that interpret and apply § 3617 in the context of firebombing, cross-burning, and other similarly overt acts of intimidation).

---

[21] And, to the extent that Echemendia is alleging any other species of retaliation based on a constitutional claim or otherwise, she is equally unsuccessful.  "[R]etaliation claims protect constitutional rights only against their *unequal* infringement." *Grossbaum v. Indianapolis-Marion County Bldg. Auth*., 100 F.3d 1287, 1296 (7th Cir. 1996).

Similarly, requesting Echemendia to supply a copy of required documents missing from her resident file is clearly reasonable, particularly when Glick requested documents during the same time period from at least three other Woodbridge tenants.  Likewise, conducting the annual HUD inspections can hardly be considered retaliatory because, as discussed *supra*, such inspections are required by HUD for re-certification of Section 8 benefits.  Finally, Echemendia's subsequent eviction is a predictable consequence of her failure to pay rent after she failed to participate in the re-certification process for her Section 8 housing.

Furthermore, while Echemendia did complain to Bane about Hankins's behavior and did voice her concerns of retaliation to Girard, none of the individual Defendants were aware that Echemendia contacted HUD with her concerns in 2002.  This fact certainly does not lend support to Echemendia's FHA retaliation allegations.

Therefore, like her claims of handicap discrimination and national origin discrimination, there is no material issue of genuine fact requiring a trial concerning Echemendia's FHA retaliation claim.  Thus, summary judgment will be granted with respect to all of Echemendia's claims advanced under the FHA.

### E.  § 504 of the Rehabilitation Act

Section 504 of the Rehabilitation Act states: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  To prevail on a Section 504 claim, a plaintiff must establish that: (1) she is an individual with a disability under the Rehabilitation Act, (2) she is otherwise qualified for the benefit sought, (3) she was discriminated against solely

21

by reason of her disability, and (4) the program or activity in question receives federal financial assistance. *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 119 (7th Cir. 1997).

Echemendia's Section 504 claim against Glick and the individual Defendants fails for a fundamental reason at the outset – they are not recipients of federal funds.  Rather, they are merely employees or agents of a recipient of federal funds, which takes them outside the scope of the statute. *Id*. at 120 ("The coverage of the Rehabilitation Act does not follow federal aid past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement." (citation omitted)).

Moreover, Echemendia's allegation that she was discriminated against on the basis of her disability *and* her Hispanic origin cuts against her Section 504 claim.  To explain, Section 504 requires that Echemendia be denied a benefit "solely by reason for her . . . disability." 29 U.S.C. § 794(a); *Grzan*, 104 F.3d at 121.  "The word solely provides the key: the discrimination must come from the handicap and from the handicap alone." *Grzan*, 104 F.3d at 121.  Here, Echemendia conclusorily alleges that she was discriminated against on the basis of her disability *and* national origin, describing a plethora of actions by Defendant that she perceives are discriminatory.  However, Echemendia never identifies which of Defendants' actions, if any, are "from the handicap and from the handicap alone."  This rings the death knell for her Section 504 claim.

Therefore, like her FHA claims, there is no material issue of genuine fact requiring a trial concerning Echemendia's claim under the Rehabilitation Act.  Thus, Echemendia's Section 504 claim fails to survive summary judgment.

*F.  Conspiracy*

22

Next, Echemendia asserts that Defendants conspired to deprive her of her civil rights; though she does not say, apparently Echemendia is proceeding under 42 U.S.C. § 1985(3) and/or 42 U.S.C. § 1986.  To establish a § 1985(3) claim, a plaintiff must show "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." *Brokaw v. Mercer County*, 235 F.3d 1000, 1024 (7th Cir. 2000) (citation omitted).  In addition, the plaintiff must allege "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Id.* (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).  Section 1986 claims are then derived from claims under § 1985 claims, imparting liability "on those who know of a Section 1985 conspiracy and do nothing to prevent it, despite their power to do so." *Alexander v. City of South Bend*, 320 F. Supp. 2d 761, 778 (N.D. Ind. May 18, 2004) (quoting *Bell v. City of Milwaukee*, 746 F.2d 1205, 1233 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005)).

Here, Echemendia has provided absolutely no evidence to substantiate her claim that Defendants' actions were premised on a disability-based or national origin-based animus shared among the Defendants. *See id.* at 778-79.  Rather, as discussed *supra* in the context of FHA handicap discrimination, Defendants produced legitimate, non-discriminatory reasons for their actions.  "A [disability or national origin]-motivated charge of conspiracy cannot be maintained where a plaintiff is unable to present non-legitimate reasons for a defendant's actions." *Alexander*, 320 F. Supp. 2d at 779 (citing *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)).

Furthermore, Echemendia has failed to produce any evidence of an actual conspiracy,

that is, the existence of "an agreement between two or more persons acting in concert to inflict an injury upon [her]." *Id.*  A claim of conspiracy "cannot survive summary judgment if the allegations are vague, conclusionary and include no overt acts reasonably related to the promotion of the alleged conspiracy." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) ("Because the plaintiff's allegations are nothing more than bald assertions without any evidentiary support, we hold that they are insufficient to establish that the defendants conspired to deprive him of his constitutional rights."); *see also Williams*, 342 F.3d at 785 (stressing that evidence of a civil conspiracy "cannot be speculative").

Clearly, there is no material issue of genuine fact requiring a trial concerning Echemendia's conspiracy claim, and thus the claim will not survive summary judgment.

### G.  Constitutional Claim Against the Individual Defendants

Echemendia also brought a constitutional claim against the Defendants concerning the annual HUD-required inspections of her apartment, asserting that they violated her rights under the Fourth Amendment to be free from unreasonable searches.  Only her constitutional claim against Bane, Hankins, and Elett with respect to the 2003 and 2004 HUD inspections remain, since her claim against the other Defendants was previously dismissed and because any claim arising from prior annual inspections is barred by the two-year statute of limitations.

In any § 1983 action, the plaintiff must prove two essential elements: (1) that the conduct complained of was committed by a person acting under the color of law, and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniel v. Williams*, 474 U.S. 327 (1986); *Bivens v. Six Unknown Named Agents of Fed. Bureau*

*of Narcotics*, 403 U.S. 388 (1971).  Although Echemendia does not mention § 1983 in her

complaint, she argued in response to Defendants' motion to dismiss that the Supreme Court's

decision in *Bivens* applies to her case. (*See* Docket # 35, 38.)  *Bivens* established that the victims

of a constitutional violation by a federal agent have a right to recover damages against the

official in federal court despite the absence of any statute conferring such a right. *Bivens*, 403

U.S. at 397.

    Here, Echemendia alleges that Defendants acted as agents for HUD when they inspected

her apartment.  Whether Bane, Hankins, and Elett were federal actors in relation to the

inspections of Echemendia's apartment, however, need not be determined, as Echemendia's

constitutional claim fails for other reasons.

    To explain, with respect to Bane and Elett, Echemendia's constitutional claim is based

solely upon the 2003 and 2004 annual HUD inspections performed by Hankins in 2003 and

2004.  However, Echemendia produces absolutely no evidence that Bane or Elett were involved

in either of these inspections. *See Gossmeyer v. McDonald*, 128 F.3d 481, 494-95 (7th Cir. 1997)

("In order to state cause of action under *Bivens*, the plaintiff must allege facts which show that

the individual defendant was personally involved in the deprivation of the plaintiff's

constitutional rights.").  Thus, there is simply no evidence to support a constitutional claim

against Bane or Elett.

    Moreover, with respect to Hankins, Echemendia has produced no evidence that the

annual HUD-required inspections constituted illegal or unreasonable searches.  To explain,

Echemendia's lease authorized the landlord to enter the unit for purposes of performing periodic

inspections, and HUD regulations require annual inspections of Echemendia's unit because of

25

her Section 8 status, (Bane Aff., Ex. A at 7); thus, in signing her lease, Echemendia clearly consented to periodic inspections by Glick personnel.  Furthermore, Echemendia does not allege that she objected to the 2003 or 2004 inspections or that they were performed without her knowledge. *See Pratt v. Chicago Hous. Auth.*, 848 F. Supp. 792 (N.D. Ill. 1994) (enjoining warrantless searches of apartments without resident consent but permitting searches with resident's oral or written consent); *see generally United States v. Aghedo*, 159 F.3d 308 (7th Cir. 1998) ("Although the Fourth Amendment generally prohibits searches and seizures performed without a warrant, there is an exception when someone with actual or apparent authority consents to the search or seizure.").

Nor does Echemendia produce any evidence that suggests the 2003 and 2004 HUD inspections were conducted in an unreasonable manner. Therefore, Echemendia's constitutional claim based on the 2003 and 2004 HUD inspections is meritless.

Simply, Echemendia has utterly failed to produce any evidence to substantiate her allegation of a constitutional violation by Bane, Hankins, or Elett, and thus no material issue of genuine fact exists requiring a trial.  Therefore, summary judgment will be granted with respect to Echemendia's constitutional claim against Bane, Hankins, and Elett.

### H.  Executive Orders 12892, 11063, and 13217

"Generally, there is no private right of action to enforce obligations imposed on executive branch officials by executive orders." *Facchiano Constr. Co. v. U.S. Dept. of Labor*, 987 F.2d 206, 210 (3rd Cir. 1993).  "Only when executive orders have specific foundation in Congressional action are they judicially enforceable in private civil suits." *Zhang v. Slattery*, 55 F.3d 732, 847-48 (2nd Cir. 1995), *abrogated on other grounds by statute* 8 U.S.C. § 1101(a)(42);

26

*see also Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1510-11 (11th Cir. 1992).

Executive Orders 12892, 11063, and 13217 claim no specific Congressional authority. *Thomas v. Butzen*, No. 04 C 5555, 2005 WL 2387676, at *11 (N.D. Ill. Sept. 26, 2005) (concluding that Executive Orders 12892 and 11063 do not create a private right of action); *Hecht v. Barnhart*, 217 F. Supp. 2d 356, 360 (E.D.N.Y. 2002) (stating that Executive Order 13217 does not create a private right of action); *but see Wallace v. Chicago Hous. Auth.*, 298 F. Supp. 2d 710, 720 (N.D. Ill. 2003) (concluding that Executive Orders 12892 and 11063 were expressly incorporated into Section 3608(e)(6) of the FHA and thus created a private right of action).  Morever, Executive Orders 12892 and 11063 "simply reiterate HUD's duty to affirmatively further fair housing . . . ." *Thomas*, 2005 WL 2387676, at *11.

Furthermore, even if a private right of action did exist, Echemendia has utterly failed to allege any evidence or advance any argument in support of these claims in response to Defendants' motion for summary judgment.  Therefore, these claims will not survive summary judgment.

### I. *Supplemental Jurisdiction Will Not Be Exercised Over Echemendia's State Law Claims*

Since Echemendia's remaining claims do not arise under federal law, *see* 28 U.S.C. § 1331, and since she does not claim diversity jurisdiction, *see* 28 U.S.C. § 1332, the only possible jurisdictional basis for the remaining claims is supplemental jurisdiction under 28 U.S.C. § 1367. However, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over [supplemental] state-law claims rather than resolving them on the merits." *E.g.*, *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir. 1998) (citing 28 U.S.C. § 1367(c)(3)).

27

Despite this general rule, Defendants contend that Echemendia's remaining state claims should be decided by this Court "given their 'patently frivolous' nature." (Opening Br. at 22.) However, it is not "absolutely clear" at this juncture that Echemendia's state claims, particularly her breach of contract claim, are "patently frivolous." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1252 (7th Cir. 1994). Consequently, this Court will follow the general rule and decline to exercise supplemental jurisdiction over Echemendia's state claims.

## V. CONCLUSION

For the reasons given above, Defendants' motion for summary judgment (Docket # 91) is GRANTED with respect to all of Echemendia's federal claims. The Clerk is directed to enter judgment in favor of Defendants and against Echemendia accordingly. The Court declines to exercise supplemental jurisdiction over Echemendia's state law claims, and thus they are DISMISSED without prejudice; consequently, Defendants' motion for summary judgment (Docket # 91) is DENIED AS MOOT as to all of Echemendia's state law claims.[22]

Enter for this 20th day of March, 2007.

/S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[22] In addition, Echemendia's Motion for Order Compelling Discovery and Disclosure (Docket # 103), which was taken under advisement by the Court pending the outcome of Defendants' motion for summary judgment (*see* Docket # 109), is hereby DENIED AS MOOT.